UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

DEBBIE ANN BROMFIELD THOMPSON           :
                                        :
                    Plaintiff,          :
v                                       :  19-CV-6078
                                        :
AMERICAN UNIVERSITY OF ANTIGUA          :
MANIPAL EDUCATION AMERICAS, LLC         :
NBME                                    :
                                        :
                    DEFENDANTS.         :
_____:


**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO AMERICAN UNIVERSITY OF ANTIGUA AND MANIPAL EDUCATION AMERICAS, LLC AND NBME'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Introduction……………………………………………………………………………… 1

Defendant AUA/MEA Arguments…………………………………………………………2

Rule 12(b)(6) Standard of Review…………………………………………………………8

Rule 12(b)(6) Factual Analysis……………………………………………………………8

Breach of Contract………………………………………………………………………15

Intentional /Negligent Infliction of Emotional Distress…………………………………16

Rule12(b)(2) Standard of Review………………………………………………………16

Application for FAFSA Loan/Accreditation NYSED……………………………………19

NYS Longarm Statute……………………………………………………………………20

AUA/MEA Service Agreement…………………………………………………………22

FRCP Rule 5………………………………………………………………………………23

NBME Jurisdictional Analysis…………………………………………………………25

NBME'S Challenge to Standing…………………………………………………………28

Conclusion………………………………………………………………………………29

Certificate of Service……………………………………………………………………30

## TABLE OF AUTHORITIES

**CASES**

A. I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)…………………16

Argenyi v. Creighton University, No. 11-333613461 (8th Cir. 2013)…………………15

Ascroft v. Iqbal, 556 U.S. 662 (2009)……………………………………………………8

Ball v.Metallurgic-Hoboken-Overpelt, S.A., 902 F.2d. 194, 197 (2d Cir. 1980……………16

Bell Atlantic v. Twombly, 550 U.S. 544, 556………………………………………………..8

Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008)…………………8

Burger King v. Rudzewica, 471 U.S. 462, 476-77 (1985)……………………………………22

Carlo Davita, President of New Beginning for Immigrant Rights v.
Steven Lang, Director Office of Legal Access Programs, 343 F. Supp. 3d (2018)…………8

Chole v. Queen Bee of Beverly Hills, 616 F.3d 158, 164 (2d Cir. 2010)……………………..27

City of Perry, Iowa v. Procter & Gamble, Co., et al., 188 F. Supp. 3d 276 (2016)………….8

Consol. Rail Corp. v. Darrone, 465 U.S. 624, 626 (1984)……………………………………9

Daimler v. Bauman, 134 S. Ct. 746, 761-62 (2014)……………………………………………25

Deutsche Bank Sec. 850 N.E. 2d at 1142-43……………………………………………………27

Doe v. National Conf. of Bar Examiners, No. 1:16-cv-264, 2017 WL
74715, at 6 (E.D.N.Y. 2017)……………………………………………………………………26

Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 86 (2d Cir. 2013)………………16

Eli Weisblum, et al. v. Prosphase Labs, Inc., et al., 88 F. Supp.3d (2015)……………………21

Elsevier, Inc. v. Grossman, 77 F. Supp. 3d 331, 341 (SDNY 2015)……………………………16

Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1988)…………………………………………9

Harriett and Westchester Disabled on the Move v. All Others
Similarly Situated, 352 F. Supp. 248, 250 (2018)……………………………………………28

Hutton v. Priddy's Galleries, Inc., 276 F. Supp. 2d 428,437 (S.D.N.Y.)…………………………26

Jason Camacho v. Vanderbilt University……………………………………………………16

Johnson v. Nextel Communications, Inc., 660 F.3d 131, 142 (2nd Cir. 2011)…………………15

Kleiman v. Elan Corp., 706 F.3d 145, 152 (3rd Cir. 2013)

Knight McConnell v. Cummins, No 635035 (NRB) 2005 WL 1398590
(SDNY June 13, 2005)…………………………………………………………………………26

Kreutter v. McFadden Oil Corp., 522 N.E. 40, 43 (N.Y. 1988)…………………………………26

Licci v. Lebanese Canadian Bank, SAL 732 F.3d 161, 168 (2nd Cir. 2013)……………………21

Metro Life Ins. Co. v. Robertson-Ceco Corp. 84 F.3d 560,566 (2d Cir. 1996)………………16

National Football League v. Miller, No. 99 Civ. 11846 (JSM)
2000 WL 335566 at 1 (SDNY Mar, 30 2000)……………………………………………………19

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)…………………………………28

Rodal v Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)……………17

Romandette v. Westabix, Co., Inc., 807 F.2d 309, 311 (2d Cir. 1996)…………………………24

Trafficante v. Metro Life Ins. Co., 409 U.S. 205, 209 (1972)

Triestman v. Federal Bureau of Prisons, 470 F.3d 471 (2nd Cir. 2006)………………………8

Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)…………………………21

STATUTES AND RULES

12(b)(2)……………………………………………………………………………………7

12(b)(6)……………………………………………………………………………………7

12(b)(5)……………………………………………………………………………………7

29 U.S.C. Section 794………………………………………………………………………8

42 U.S.C. Section 12101……………………………………………………………………8

28 C.F.R. Section 36.104……………………………………………………………………9

NY CPLR Section 302(a)……………………………………………………………………17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| DEBBIE ANN BROMFIELD THOMPSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| against | : | 19-CV-6078 |
| | : | |
| AMERICAN UNIVERSITY OF ANTIGUA/ | : | |
| MANIPAL EDUCATION AMERICAS/LLC; | : | |
| NBME, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO AMERICAN UNIVERSITY OF ANTIGUA AND MANIPAL EDUCATION AMERICAS, LLC AND NBME'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, Debbie-Ann Bromfield-Thompson, *pro se,* respectfully submits the following

Consolidated Memorandum of law In Support of Plaintiff's Opposition To American University of

Antigua and Manipal Education Americas, LLC and NBME's Motion to Dismiss Plaintiff's First

Amended Complaint.

**<u>Introduction</u>**

On January 5th, 2010 American University of the Caribbean (AUA), an offshore medical

school located on the Island of Antigua admitted Plaintiff to its medical school as a 5th

semester transfer student from St. Matthews University, an offshore medical school located on

the Island of Grand Cayman.  Although Plaintiff was accepted for the May 20th, 2010 semester,

her admission was deferred until the Fall of 2010 because AUA was unable to grant her request

to commence clinical rotations at their New York City site which was closer to her residence in

Washington, D.C.  Ultimately in the Fall of 2010 Plaintiff began her rotation at AUA's New York

City site at Wycoff hospital in internal medicine (I

On December 14th, 2010 Plaintiff sought accommodation from AUAICM shelf exam. AUA was unsure about what to do because it was the first time a student had requested accommodation to take the exam, and they had no department or personnel on board in the United States to handle accommodation requests.  It was suggested that Plaintiff should contact Dr. Rice in the country of Antigua because he was the person who taught psychology courses at that AUA school.  Plaintiff contacted Dr. Rice and sent him via facsimile a 20-page report from her clinical psychologist detailing her need for accommodation.  Plaintiff took and passed the ICM exam after Plaintiff was granted accommodation of time and a half.

Plaintiff waited roughly seven months to obtain her next rotation because AUA did not have sufficient sites for its clinical rotations in the United States.  Plaintiff began this clinical rotation in  Family Medicine at Maryland General Hospital in July 2011 which ended in October 2011.  Plaintiff was scheduled to begin her next clinical rotation in November 2012, a wait of a little more than a year because AUA had limited sites.  Prior to the start of the clinical rotation Plaintiff was contacted by her clinical coordinator, Maria Pimentel, from New York City, who told Plaintiff that the rotation had to be cancelled in favor of students whose graduation were imminent.  Plaintiff was not assigned any clinical rotation until September 2012, an eleven month wait.

Because AUA had few sites for clinical rotations Plaintiff sought and was able to obtain clinical rotations in Baltimore, Maryland.  Thus, even though Plaintiff began attending AUA for her clinical programs beginning Fall 2010, she was only assigned 2 clinical rotations by AUA in a 2-year span.  By the time AUA started assigning clinical rotations to Plaintiff on a consistent basis, the school had changed its policies by instituting a requirement that all students should sit for the shelf exams and the Comprehensive Clinical Shelf Exam (CCSE).  The shelf exams and the CCSE exams are old exams sold to the school by the National Board of Medical Examiners, which in turn uses these exams to measure students proficiency in a variety of subject areas

before allowing students to sit for the official exams administered by NBME.When Plaintiff

became eligible to take her shelf exam in Family Medicine, Plaintiff

discovered that no arrangements were made for accommodations at the exam site, despite the

fact that AUA had a 20-page report detailing her need for accommodation on file.  When she

asked  that the exam be re-scheduled Plaintiff was told by AUA's personnel in the New York

City office that AUA had not received the "notice" in time to do so.  Plaintiff took the exam

without appropriate accommodation and failed.  Plaintiff notified Executive Dean of Clinical

Studies, Dr. Peter Bell, in AUA's New York City office about the AUA's failure to recognize that

she needed accommodation even though she had submitted a report to them.  Subsequently,

AUA  arranged for proper accommodation and Plaintiff re-took the exam and passed with a

score that exceeded the minimum score required by AUA.  The same was true with respect to

the OB/GYN exam whereupon being given appropriate accommodation (time and a half)

Plaintiff's passing grade exceeded the minimum score required by AUA.

      As a result of Plaintiff's complaints regarding her accommodation AUA instituted a new

policy to the effect that students seeking accommodation were required to notify the

administration within 5 business days from the start of any clinical rotation or exams.  For every

accommodation extended by AUA Plaintiff was required to pay a fee.

      On June 11th, 2015 Plaintiff was administratively withdrawn from AUA.  The reason for

the withdrawal was vigorously disputed.  AUA contended that Plaintiff had to be withdrawn

because a student who has been inactive for more than "6 months" is subject to administrative

withdrawal.  Plaintiff challenged the decision because her second child was born in June 2015

and in the period leading up to the birth she was unable to travel for clinical rotations.

      On June 17th, 2015 AUA re-admitted Plaintiff to the medical school, but set forth the

condition that Plaintiff complete the remaining requirements for graduation no later than "March

31, 2016", a daunting schedule given Plaintiff's disability and AUA's unreliability in arranging for accommodations and assigning sites for clinical rotations.  AUA also conditioned Plaintiff's re-admission on passage of the CCSE exam with a score of at least 79 in order to be certified to take the USMLE Step 2 CK.  Pursuant to AUA's written policy at the time Plaintiff was able to sit the exam for an unlimited number of times until passage.  The policy was later modified to limit to three attempts students who entered their 4th year in 2015, **but this did not apply to Plaintiff**.  According to AUA, failure to satisfy the requirements by the set date would result in dismissal.  The new requirements imposed by AUA were not in effect at the time Plaintiff had enrolled with the school.  Plaintiff was of the belief that AUA was planning to retaliate against her for having vigorously advocated for reasonable accommodation.

Plaintiff failed the exam on her first three attempts (8-222014;10-24-2014; 8-28-2015). Plaintiff attributed her failure to to the fact that she being accommodated with only one and a half times the duration of the exam.  Plaintiff clinical report on file with AUA had recommended up to double time on exams.  Recognizing that her failures had nothing to do with her level of preparation Plaintiff contacted Dr. Bell, the Executive Dean of Clinical Studies in New York City, who advised her to contact Dr. Rice in the country of Antigua.  Plaintiff wrote Dr. Rice seeking double time who in turn responded that she needed to "justify the request" with **recent** testing certifying that she was dyslexic.  To expedite the process, Plaintiff sent a letter to Dr. Rice from her clinical psychologist justifying the need for double time.  Dr. Rice agreed to grant the request provisionally, pending receipt of the full report.  Dr. Rice communicated his approval through AUA's New York's office, but it came too late for Plaintiff to sit the CCSE exam with double time. Like the first report in 2010, the full report from Dr. Rachna Varia was sent to Dr. Rice in October 2015.

On November 25th, 2015 Plaintiff took the CCSE exam for the first time with double time accommodation which was unlike the previous three attempts which gave her one

and a half extended time.  Plaintiff sat the exam for 9 straight hours without breaks in between and suffered excruciating pain in her feet in the last two hours of the exam resulting in Plaintiff guessing a significant number of answers just to get through the exam.  According to the proctor at the NBME sponsored site she was not allowed to take breaks.  After Plaintiff was notified that she did not attain the required score on the exam Plaintiff contacted NBME directly to complain about the conditions under which she had previously taken the exam: either not being given sufficient time or in the one instance when she was given double time she got no breaks in between.  NBME personnel explained that the USMLE Step 2 CK  exam which mirrored the practice exam in length and complexity was given over a 2-day period and suggested that Plaintiff contact AUA to determine whether AUA would be willing to find a site where Plaintiff could take the exam over a 2-day period.  NBME promised that it would send a proctor.

On January 15th, 2016 Cheri Kershen, Manager NBME Test Administration, copied Plaintiff on a letter she had sent to AUA describing the procedures under which Plaintiff was able to sit the CCSE exam over a 2-day period. (**Exhibit 1).**  According to Ms. Kershen, AUA could attempt to make arrangements with an NBME approved site for Plaintiff to sit the exam.  AUA was unable to locate an approved site.  Dr. Peter Bell, Executive Dean of Clinical Science, referred Plaintiff to AUA's Ombudsman to assist in  finding a site, but he had not understanding whatsoever of the issues.  Dr. Bell also referred the matter to Dr. Juli Valtschanoff, purportedly AUA's Chief Proctor whom plaintiff had never before interacted with.  Dr. Valtschanoff sent Plaintiff an email stating that he was unable to locate a site for the taking of the exam over a 2-day period, and advised Plaintiff to "take the exam like any other student needing "accommodation".

Because of AUA's delay in finding a site to accommodate Plaintiff, the March 31st deadline imposed by AUA for completion of all exams and courses became unrealistic.

Consequently, Dr. Bell extended the deadline to July 31st, 2016.  It took AUA 8 months from the time of Plaintiff's last unsuccessful attempt (November 25th, 2015) to schedule the exam with breaks.  Plaintiff took the exam on July 1st, 2016. This came about as a result of an arrangement amongst NBME, AUA's New York City office, and the pro metric Center located in Virginia to add more than double time to enable Plaintiff to take breaks.  The way this plan was designed to work was that an extra one hour and four minutes would be built into the exam to enable Plaintiff to take breaks.  However, the exam which was computerized would not stop running during these breaks.  Although Plaintiff believed that the plan was flawed Plaintiff had little choice but to go along given the deadline for completion imposed by AUA.

On July 1st, 2016 Plaintiff took the exam and sat for 11 hours at a desk which had a large metal sheet underneath which blocked her from stretching her legs.  When Plaintiff took breaks the exam continued to run and when Plaintiff returned the screen would go blank.  Each time Plaintiff would notify the Proctor of the problem whereupon she would call in to the technical department by phone for assistance.  The exam had its own time on the screen but it kept running when Plaintiff left for breaks.  Each time Plaintiff returned from a break she had to be patted down, an event that caused her to panic even more because these extra delays caused time to run even more.

Despite the extra time allotted Plaintiff experienced fatigue and pain which convinced Plaintiff even more that this practice CCSE exam ought to have been given under the same conditions as the official exam: 2 days of 4 hours each day with breaks in between with the clock stopped during breaks.

At the end of the July 1st double time exam, the Proctor gave Plaintiff a card to call in the event any issues arose concerning the exam.  According to the proctor someone from Prometric would be able to verify the issues that arose during the taking of the exam.  However, there is no indication that anyone from AUA or for that matter the United States

Department of Education that reviewed the case contacted the Prometric Center to corroborate Plaintiff's account of what had occurred during the taking of the exam.

Plaintiff received a score of 72 on the exam, seven points short of the 79 required for passing.

Plaintiff then sent a letter to AUA explaining that the decision to have her sit an exam for an 11-hour period with breaks while the exam ran was not reasonable accommodation. She received the following letter from Kristal Booth, Registrar for AUA "I am sorry to hear of the personal issues you faced with this exam. AUA's efforts (along with NBME and Prometric) to accommodate your testing needs have been more than reasonable and unfortunately we are unable to accommodate another attempt at this exam. This email is to confirm that based on your recent score, you have been dismissed from the University. You will receive a formal letter of dismissal from the Promotions Committee within 1-2 days. If you wish to appeal this decision, you may do so at this time." In response, Plaintiff sent an email noting that this was the first time that AUA had given a "halfway decent…but less than ideal accommodation" with respect to the CCSE practice exam. Plaintiff accused the school of basing its approach to accommodation on "trial and error". Plaintiff characterized the efforts at accommodating her as "flawed" because of the failure to accommodate her over a 2-day period as was recommended by NBME.

Plaintiff appealed AUA's decision to dismiss her from the medical school. On July 17th, 2016 the AUA Appeals Committee acknowledged receipt of the appeal. However, the merits of Plaintiff's appeal were never adjudicated. At the time of Plaintiff's dismissal she had incurred student loan debts in excess of $200,000.00 in pursuit of her medical license.

**Defendant AUA/MEA  Arguments**

Defendants AUA/MEA ground their arguments on Federal Rules of Civil Procedure

Rules 12(b)(2) (lack of personal jurisdiction); 12(b)(5) (insufficiency of process); and 12(b)(6) (failure to state a claim upon which relief may be granted)..  Each of these arguments will be dealt with herein.

**Rule 12(b)(6) Standard of Review**

When Rule 12(b)(6) is invoked it must be determined whether the facts alleged in the complaint are sufficient to show that plaintiff has a plausible claim for relief. *Ascroft  v. Iqbal,*556 U.S. 662 (2009).  The court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 124 (2d. Cir. 2008).  A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft*, at 678.  Thus, a plaintiff must show "more than a sheer possibility that a defendant acted unlawfully", and cannot rely on mere "labels and conclusions" to support a claim. *Bell Atlantic v. Twombly,* 550 U.S. 544,556 (2007).  Statements or documents incorporated into the complaint by reference, are assumed to be true for the purposes of the motion.  *See, e.g.., City of Perry, Iowa v. Procter & Gamble, Co., et al.,* 188 F. Supp. 3d 276 (2016); *Kleiman v. Elan Corp.,* 706 F.3d 145, 152 (3rd Cir. 2013).  Furthermore, the court must liberally construe the allegations in the complaint and interpret them to raise the strongest arguments that they suggest.  *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471 (2nd Cir. 2006); *Carlo Davita, President of New Beginning for Immigrants Rights, Inc. v. Steven Lang, Director Office of  Legal Access Programs,* 343 F. Supp. 3d 254 (2018).

**Rule 12(b)(6) Factual Analysis**

Plaintiff's complaint does make out federal causes of action under Section 504 of the Rehabilitation Act (29 U.S.C. Section 794) and for violation of the American With Disabilities Act (42 U.S.C. Section 12101).  The complaint also makes out State law claims for breach of contract.  The purpose of the ADA in part was was to provide clear, strong, consistent

enforceable standards to remedy discrimination in places of public accommodation.  Title 111

Section 12101(b)(2).   Under Title 111 places of public accommodation include "undergraduate

or postgraduate schools such as AUA.  28 C.F.R. Section 36.104.  The Rehabilitation Act is

similar to the ADA.  Congress enacted the Rehabilitation Act as a "comprehensive program",

*Consol. Rail Corp. v. Darrone,* 465 U.S. 624,626 (1984), to ensure that individuals with

disabilities would not be denied the benefits or be subjected to discrimination under any

program or activity receiving federal funding.  29 U.S.C. Section 794(a).  AUA receives financial

assistance from the US Department of Education by way of its students being able to apply for

FASFA loans, so it must comply with the Rehabilitation Act.  Since the ADA and Rehabilitation

Act are similar in substance, they are treated as interchangeable.  *See Gorman v. Bartch, 152 F.

3d 907, 912* (8th Cir. 1988).

 Defendant's motion to Dismiss does not challenge Plaintiff's contention that she suffers

from dyslexia, which limits at least one of Plaintiff's major life activities: learning and taking

exams.  Instead, Defendant has fashioned a numerosity argument, namely that the fact that it

has accorded Plaintiff some 5 chances to sit the CCSE exam and the fact that defendant

progressively agreed to extend the duration of each exam in order to facilitate the taking of

breaks, such receptiveness constitutes "reasonable accommodation".  (AUA's Motion to

Dismiss, pp. 2-5).  This argument ignores the real issue here: was the accommodation extended

reasonable under the circumstances?  Put more concretely, is it reasonable to require a student

suffering from dyslexia to sit for 9 hours straight without breaks as was the case in the taking of

the exam? Was it reasonable to require a student to sit for 11 hours with breaks built in while the

exam kept running on the computer?

 For elucidation on the above questions we may look to how the National Board of

Medical Examiners (NBME) conducts the exam.  As set forth in Plaintiff's complaint, the CCSE

exam is owned exclusively by NBME and sold to medical schools for use as practice exams to prepare students for the sitting of the USMLE, Step 2 CK.  NBME administers the exam over a 2 day period with breaks in between as an accommodation to students who have been certified to be dyslexic.  The NBME also also sells the practice exam to onshore medical schools throughout the United States.  These onshore medical schools extend accommodation to their dyslexic students by allowing them to sit the practice exam over a 2-day period.  Although NBME allows dyslexic students to sit for the official CCSE exams over a 2-day period at prometric centers, they lack the ability to extend similar accommodations of 2 days to dyslexic students for the taking of the CCSE practice exams.  This is so because they have not devoted the time and expense to programming their systems to accommodate students for the taking of practice exams at the prometric centers. As such, accommodation was extended to plaintiff by way of trial and error, and not based on what was deemed to be reasonable by NBME's own internal determinations with respect to dyslexic student on a whole.

Here, AUA was not approved by NBME to administer the examination anywhere, unless under the auspices and supervision of an NBME proctor.  (**Exhibit 1**).  In fact, Cheri Kershen' letter to Craig Hauser, Associate Vice President for University Administration, which was transmitted to AUA's  New York City Office  clearly stated "As you are aware, American University of Antigua does not administer subject examinations at the medical school. If Debbie-Ann would like to take the CCSE at an institution where she is doing a rotation, that institution must currently administer subject examinations" (**Exhibit 1**). Upon receipt of Ms. Kershen's letter plaintiff suggested to AUA's New York City office that they may want to consider contacting University of Maryland and Johns Hopkins University to determine whether either institution would allow plaintiff to sit the CCSE exam at their facility.  Soon thereafter, plaintiff received a letter from Dr.  Juli Valtchanoff who stated that he was unable to locate a facility where plaintiff could take the exam but that she should sit the exam

like all other students needing accommodation. This was the first time Plaintiff became aware of the existence of a Chief Proctor at AUA.  Plaintiff had never before communicated with  Dr. Valtchanoff on any matters regarding accommodation or any other issues whatsoever. Similarly, Plaintiff's only communication with Dr. Rice, the person who was responsible for making accommodation decisions, had to do with faxing him her clinical report in 2010 and notifying him in 2016 that given the breadth and complexity of the CCSE practice exam her accommodation needed to be extended  as set forth in her clinical report which had been previously sent to him.  Apparently, he was unable to locate the report and asked for an updated one to be sent.  Plaintiff obtained a second evaluation and report at a cost of $3000.00.  It was clear to plaintiff that Dr. Rice lacked any understanding of plaintiff's condition since dyslexia is not curable and does not get better with the passage of time.  Hence, an updated report was unnecessary, but sent anyway.

Defendant appears to suggest that the findings issued by the Office of Civil Rights, United States Department of Education, ought to be dispositive as evidenced by its submission of the report to this court exonerating AUA.  However, the OCR report is not binding on this Court.  OCR recognizes as much when it fulfilled its statutory obligations by notifying Plaintiff that its findings were non-binding and therefore did not preclude Plaintiff from filing her claims in federal court. OCR conducted no hearing, except that it received written submissions from both sides.Plaintiff had appealed OCR's  findings but for over three years now no decision has been rendered even though receipt of the appeal was acknowledged.

Defendant's statement that Plaintiff's appeal of her dismissal was affirmed by AUA, is simply not true.  Significantly, defendant has not attached a copy of the decision from the AUA appeals office nor has defendant proffered any evidence to suggest that to the extent an appeal decision had just one word "AFFIRMED" ,defendant was duly notified.

Plaintiff's complaint raises serious issues with respect to whether AUA complied with the ADA and the Rehabilitation Act.  AUAs grounds its legal arguments largely on the fact that it gave plaintiff numerous opportunities to take the exam and that it did its best to accommodate plaintiff by extending the time for the taking of the exam.  Nothing in the science of accommodation for dyslexic students suggests or implies that a school's obligation to extend reasonable accommodation lies in "numerosity" or simply giving "more time".  Clearly, AUA's belief that this is the be all, end all of accommodation for a dyslexic student suggests that it does not comprehend its obligations under the ADA and the Rehabilitation Act.  Plaintiff is a student who excels in her course work as AUA well knows.  Plaintiff's GPA in medical school was 3.65 and she was just 3 credit hours shy of graduating.  Plaintiff graduated *magna cum laude* in Biology from Howard University.  Nothing in plaintiff's past shows that she was using her need for accommodation to gain some unfair academic advantage or that she  was unprepared to take the exam.  The problem was that the accommodation was inadequate, exposing plaintiff to long hours of testing.  If anything, the testing under conditions of long hours was measuring plaintiff's dyslexic condition and not her cognitive abilities.  Plaintiff will be willing to offer proof of the following facts at a trial of this case:

1.      The NBME accommodates dyslexic students with testing  for the similar USMLE Step 2 CK over a 2-day period with breaks in between.

2.      In all matters related to plaintiff's accommodation plaintiff had to spend long hours on the telephone with AUA's New York office and participate in multiple email exchanges to arrange and set up her requests for accommodation, a very exhausting  endeavor.

3.      When plaintiff took the CCSE practice exam on three prior occasions it took some time to appreciate that the breath and complexity of this exam were different from all others and required more extended time as recommended by her psychological report.

4.      If AUA had a department committed to accommodation plaintiff would have been aware

of the nature of the CCSE practice exam and would not have wasted time attempting to take an exam under unreasonable time limits resulting in inexorable failures.

5.      No one at AUA was even aware that the official CCSE exam was given over a 2-day period to dyslexic students, at least until Ms. Kershen from NBME  so apprised Mr. Hauser in a letter.  (**Exhibit 1).**

6.      When plaintiff received approval from AUA for  extended time she sat the exam for 9 hours straight and was told that she was not permitted to take breaks, which caused her to experience severe fatigue resulting in a disastrous score.

7.      The CCSE practice exam mirrors the USMLE Step 2 CK offered as a licensing exam by NBME and which passage is a condition precedent to the taking of the USMLE Step 2 CK.

8.      AUA and NBME collaborated to create breaks in the practice exam by requiring plaintiff to sit the exam for 11 hours, which was unworkable because when plaintiff took breaks the exam kept running, she had to be patted down when she returned to the exam room, she was seated in an awkward position, and there were technical difficulties where the screen went blank at times.

9.      Despite plaintiff's best efforts she was unable to pass the exam under the conditions that were afforded, because of stress and fatigue which were above and beyond what is normal for regularized exam taking.

10.     Both the practice exam and the USMLE Step 2 CK are equally important and there should be no discrimination in the manner in which they are offered to dyslexic students, albeit the cramming of the practice exam in one day and the setting of the USMLE Step 2 CK over a 2 day period.

11.     AUA is an offshore medical school whose headquarters for its clinical program is located in New York City, thereby subjecting it to the rules and laws of the City and the United States.

12.     AUA's justification  that it was unable to find suitable location for the taking of the exam over a 2 day period as recommended by NBME cannot be a valid justification given that it boasts on its website that it has affiliations with teaching hospitals and other medical institutions throughout the entire United States.

13.     Plaintiff was not asking AUA to change the nature of the exam.

14.     When AUA communicated that it was impossible to accommodate plaintiff's request to take the test over a 2-day period plaintiff was left with little choice but to seek a waiver of the condition for taking the test given the impossible deadline that AUA had imposed for completing all course work and given the fact that plaintiff was not optimistic that she would pass the exam in light of the extreme and inhumane conditions under which she was required to sit the exam.

15.     The deadline imposed by AUA for plaintiff to complete her course work and graduate from the program were the types of deadlines proscribed by United States Justice Department guidelines with respect to dyslexic students.

16.     Although a student under NBME guidelines is required to graduate within seven and a half years much of the delay regarding graduation is attributable to AUA which notwithstanding its promises in luring plaintiff to its school was unable to locate suitable clinical sites for plaintiff for roughly a 2-year period.

17.     First and foremost plaintiff wanted to take the practice exam and had no need or interest in seeking special treatment.

18.     Plaintiff's failure grades on the CCSE exam tested plaintiff's dyslexic condition, and not her medical knowledge, nor cognitive skills and aptitude.

19.     Ws the accommodations extended by AUA for the practice exam reasonable in light of the objective policy and determinations that an exam of the CCSE's breath and complexity ought to be given over a 2-day period with breaks in between.

        Defendant's recitations of the number of times plaintiff failed the CCSE exam implies that

her request to sit it over a 2 day period with breaks in between was not necessary in light of previous failures.  In *Argenyi v. Creighton University,* No. 11-333613461, Us Court of Appeals (8th Cir. 2013) the court grappled with an issue not dissimilar.  The district court had ruled that Argenyi, a medical student who had requested specific accommodation for his hearing impairment was unable to prove that the accommodation requested was "necessary".  The Eight Circuit Court of Appeals reversed, because the evidence produced had created a "genuine issue of material fact" as to whether Creighton University had denied Argenyi an equal opportunity to gain the same benefit from medical school as his non disabled peers by refusing to provide his requested accommodation.  *Id.*

**Breach of Contract**

The elements of breach of contract are formation of contract between the parties, performance by plaintiff, failure of defendant to perform, and damages resulting from the breach.  *Johnson v. Nextel Cpmmunications, Inc.,* 660 F.3d 131, 142 (2nd Cir. 2011).  Defendant made false representations to lure plaintiff to attend its medical school.  Specifically, defendant stated that it had numerous clinical sites all across the United States which was untrue. Defendant also presented plaintiff with a student  handbook which set forth procedures for granting accommodation.  Plaintiff relied on defendant's representations only to experience difficulties getting defendant to fulfill its promises.  Defendant fabricated a pretextual reason to administratively withdraw plaintiff from the university claiming that she had not commenced a clinical rotation within six months of her last rotation as required by the rules.  Upon reinstating plaintiff to the medical school, defendant imposed strict time constraints for the completion of her degree knowing full well that the grant of accommodation was essential to her fulfilling the terms of her readmission.  Defendant failed to grant the required accommodation and after plaintiff failed the exam she was dismissed from the school.  At the time of her dismissal plaintiff

was just 3 credit hours short of graduating.

Closely related to the breach of contract cause of action is the breach of the covenant of good faith and fair dealing. At the time of plaintiff's dismissal she had a 3.65 GPA and she was a *magna cum laude* graduate of Howard University with a degree in Biology . Plaintiff has suffered injuries as a result of defendant's breach as she has struggled to maintain payments of some $200,000.00 in student loans and her pursuit of becoming a doctor has been delayed. Plaintiff is aware that in this jurisdiction this cause of action is considered duplicative of the contract claim. However, whether it survives or get dismissed will depend on what choice of law the court utilizes be it Washington, D.C. or New York State.

**Intentional/Negligent Infliction of Emotional Distress**

Plaintiff will dismiss this cause of action given the quantum of proof needed to prove same.

**Rule 12(b)(2) Standard of Review**

On a Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction, plaintiff bears the burden of proving that the court has jurisdiction. *Metro Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566 (2d. Cir. 1996). To survive a motion to dismiss a plaintiff need only prove "legally sufficient allegations of jurisdiction". *Id.* A plaintiff makes such a showing through an "averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgic Hoboken-Overpelt, S.A.,* 902 F.2d. 194, 197 (2d Cir. 1990). Thus, plaintiff's jurisdictional allegations are construed in the light most favorable to the plaintiff and all doubts are resolved in the plaintiff's favor. *Elsevier, Inc. v. Grossman,* 77 F. Supp. 3d 331, 341 (SDNY 2015), *quoting, A. I. Trade Fin., Inc. v Petra Bank,* 989 F.2d 76, 79-80 (2d Cir. 1993). If the court does hold an evidentiary hearing on the jurisdictional question, it may, nevertheless, consider matters outside the pleadings. *Dorchester Fin., Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81,86 (2d Cir. 2013); *Jason Camacho v. vanderbilt University.*

FRCP Rule 12(b)(2) also involves a two part analysis: (a) whether there is a basis for personal jurisdiction under the laws of the forum state, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 168 (2d Cir. 2013), which in this case implicates New York's long arm statute which state that a court may exercise jurisdiction "over any non-domicillary…who in person or through an agent…transacts any business within the state," so long as the cause of action "arises from" that transaction.   N.Y. C.P.L.R. Section 302(a)(1).   Second a court must examine whether the exercise of personal jurisdiction accords with due process.   *Licci,* 732 F.3d at 168.   "Due process considerations require that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."   *Id.*

First, defendant should be estopped from arguing that this court lacks jurisdiction given that defendant accepted and submitted to the jurisdiction of OCR in New York City without challenging their jurisdiction.   *Rodalv. Anesthesia Grp. of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004) (doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position advanced in another proceeding).

Defendant's assertions that it has no office in New York City is absurd.   Plaintiff's complaint has averred that virtually all of plaintiff's dealings with defendant occurred by way of emails and telephones between Washington DC and New York City.   This is further buttressed by Plaintiff's Declaration which details the history of plaintiff's dealings with defendant. Plaintiff will again recount this history which is set forth in plaintiff's complaint and supported by her Declaration .   In 2010 plaintiff contacted AUA 's clinical department in New York City regarding transferring to their medical school to commence clinical practice.   Plaintiff was told at the time that there were no sites in Washington DC, but that all of AUA's clinical sites were located in New York City and that plaintiff would have no problems getting assigned to clinical

sites in that state.    Plaintiff's orientation took place in New York City at Wycoff Hospital under

the supervision of AUA New York City personnel.  Plaintiff attended her first clinical course  in

Internal Medicine at Wycoff hospital, AUA's approved site.  Plaintiff sat her very first clinical

exam in Internal Medicine at Richmond University in New York City, which was an AUA

approved location for the taking of clinical exams.

Over the years plaintiff was assigned various clinical coordinators from the New York

City office who would prepare paper work and notify plaintiff as to clinical openings around the

country, including New York City.  There was only one clinical site in Washington DC, St.

Elizabeth Hospital where plaintiff was schedule to do a clinical rotation in psychiatry prior to her

unceremonious dismissal.  Plaintiff never was able to commence this clinical rotation.  Over the

years Plaintiff interacted on a regular basis with her assigned clinical coordinators in New York

City by email and by telephone.  They included:  Antonia Craig, Corey Greenberg, Maria

Cepeda, Maria Pimentel, Dan O'Connell, and Corey Lederman.  Plaintiff also interacted with the

Executive Dean, Dr. Peter Bell  on a range of issues including her accommodation.  As is set

forth in Plaintiff's Declaration she has never visited AUA's Antiguan campus nor

has she ever engaged in any substantive discussions with any AUA employee(s) in Antigua

concerning her need for accommodation or for that matter any other issues.  As per instructions

from AUA's New York City office in 2010 she did  send via facsimile her clinical report to Dr.

Rice.  Again in 2016 acting on instructions from AUA's New York City office plaintiff notified Dr.

Rice via email that she needed approval for double time to sit the CCSE exam.  It appears that

this is the basis on which defendant is resting in part the argument that jurisdiction over

plaintiff's discrimination complaint lies in Antigua, not New York City.  These are not even

minimal contacts with Antigua, they are infinitesimal contact, consisting of ministerial acts that

cannot be said to rise to a level that would confer jurisdiction in that country.  In fact, the

argument is plainly absurd.  To prove its point AUA attaches an agreement between AUA and

MEA that delineates various responsibilities of each party.  If anything, this agreement proves

the point that an agency relationship exists between AUA and MEA.  In fact, as is set forth in

plaintiff's complaint virtually all the emails sent from AUA's New York City Office lists MEA as

their agent or representative.  Plaintiff avers that she possesses hundreds of email with the

same designations:  "AUA/MEA as agent for American University of Antigua.

AUA also attached to its motion cases in which a New York City state court ruled that it

had no jurisdiction over a litigant's complaint, as well as an additional case from Antigua that

had been appealed to the United Kingdom Privy Council.  By so doing, AUA appears to suggest

that there is some overarching legal principle that stands for the proposition that courts in New

York City cannot exercise personal jurisdiction over it.  However, this ignores the fact that the

exercise of personal jurisdiction is case specific. *National Football League v. Miller,*  No. 99 Civ.

11846 (JSM), 2000 WL 335566 at 1 (S.D.N.Y. Mar. 30, 2000). One would not expect, for

example, that if a student suffers personal injury at AUA's school on the Island of Antigua, a

court in New York City would have jurisdiction to adjudicate personal injury claims without a

showing of some nexus and casual relationship to AUA's activities in New York City.  Thus,

these attachments are unhelpful.

**APPLICATION FOR FAFSA LOAN AND APPLICATION FOR CERTIFICATION FROM NEW
YORK STATE EDUCATION DEPARTMENT**

AUA has the ability to illuminate the issue of jurisdiction for this court by attaching its

application for FAFSA and its application for accreditation from New York State Education

Department, both of which are highlighted on AUA's website.  These are documents submitted

under oath and penalties of perjury and executed either by the President or an officer of the

university.  Did AUA state in its applications that it has no office from which it conducts business

in New York City but only exclusively on the Island of Antigua? It strains credulity to believe that

FAFSA would be making loans to students on the Island of Antigua attending a university with no nexus to the United States except through an entity (MEA) that undertakes back office operations on its behalf.  The same is true with respect to its accreditation from New York State Education Department.  Is NYSHI giving out certification to institutions in foreign jurisdictions where the institution has no nexus to the state, not even an office.  And the question must also be asked of NBME, is this entity contracting with AUA for the sale of their exams to be utilized exclusively on the Island of Antigua?  Ms. Kershen of  NBME did answer that AUA was not authorized to give its exam at its university. A FOIA request  from the state and federal governments would prolong the litigation perhaps beyond the patience of this court. However, if this court is disinclined to find personal jurisdiction plaintiff seeks an opportunity to conduct jurisdictional discovery.

Plaintiff maintains that AUA has an office in New York City from which it oversees its clinical programs.  The fact that it is not registered with the New York State Corporation is not persuasive.  It is clear that their operations are more akin to that of a sole proprietorship than that of a statutory legal entity subjected to State registration requirements.  As is set forth in plaintiff's affidavit, plaintiff has made and received voluminous telephone calls to AUA over the years at their (212) New York City office.  Plaintiff has hundreds of emails that emanated between plaintiff and various personnel in  AUA's New York City office.  This is the same office that handles clinical assignments for the more than 1000 students who undertake clinical rotation in the United States .  As previously stated, plaintiff attended her enrollment orientation in New York City at the Wycoff hospital under the auspices of AUA, completed her first clinical rotation in New York City at an AUA approved site, Wycoff hospital, and sat her first exam for which she was given accommodation at an AUA approved site, Richmond University.

**NYC Longarm Statute**

AUA has attempted to trigger New York State's long arm statute even though its

continued presence in the state belies its argument that it has no offices in New York City and that it is exclusively located on the Island of Antigua.  AUA argues that it uses MEA as an agent for its New York City operations, which again is belied by the facts.  However, even if the court were to credit this aspect of AUA's argument it is clear that AUA activities are captured by the longarm statute which speaks to a "non-domicilliary.. who in person or through **an agent** transacts any business within the state", and the claim asserted must arise from that business activity.  Section 302(a)(1). As set forth herein, AUA has been transacting business through its New York City office with Plaintiff specifically  for almost 10 years, and it has been doing so regularly with thousands of other students over the years.  The "arising from" element does not require a "casual link" between the defendant's New York business activity and a plaintiff's injury," but rather a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former."  *Licci v. Lebanese Canadian Bank, SAL* 732 F.3d 161, 168 (2d Cir. 2013).

On every single sitting of the CCSE exam, AUA  from its NYC office made the accommodation arrangements with NBME, paid the fees, and prescribed the nature of the accommodation as it has been doing since plaintiff enrolled in the clinical program.  The fact that plaintiff was instructed to send via facsimile a copy of her clinical report to a person in Antigua does not change the character of AUA's operations.  As an example, the fact that a person's telephone call is routed from the United States to say India to get a complaint addressed does not change the fact that jurisdiction over the company likely lies in the United States, not India.Thus, defendant has been engaged in "continuous, permanent, and substantial activity in New York".  *Eli Weisblum, et al. v. Prosphase Labs, Inc. et al.,* 88 F. Supp. 3d (2015), *quoting, Wiwa v. Royal Dutch Petroleum Co.,* 226 F. 3d 88, 95 (2d Cir. 2000).  Given that AUA has engaged in "purposeful availment" of the benefits and privileges of New York Law,

it is reasonable, fair and just for this court to exercise general jurisdiction over their activities

since its affiliations with the State are so continuous and systematic as to render them at home

with the forum state.  *Eli Weisblum, supra,* at 284; *See also AUA's forum selection clause in its*

*service agreement with MEA.*

      Furthermore, New York is a convenient forum for adjudicating plaintiff's claims.    All the

witnesses that interacted with plaintiff via the telephone and through emails work in New York.

Exexcutive Dean, of Clinical Sciences, Dr. Peter Bell was actively involved in assisting with

plaintiff's accommodation issues. Craig Hauser in New York City was the person who ensured

that the NBME's prometric centers implemented the procedures for accommodation.  The

 coordinators listed herein interacted from with plaintiff from AUA's NYC office.  Additionally,

plaintiff may also designate witnesses (proctors) from the prometric center, as well as Cheri

Kershen, who works out of NBME's Philadelphia office.  Plaintiff's clinicians who may testify are

located in Washington, D.C.  The cost and burdens of getting these witnesses to appear in

Antigua would not just be enormous, but would make little sense given that plaintiff has had no

contact with Antigua.    Adjudicating the case in New York would further efficient resolution of the

controversy, and promote social justice by delineating the scope of a medical school's

responsibilities with respect to extending reasonable accommodation under the ADA and

Rehabilitation Act.  *See  Burger King v. Rudzewicz,* 471 U.S. 462, 476-77 (1985).

## AUA/MEA Service Agreement

      Vernon Solomon, Vice President of AUA's Community Affairs, states in his Declaration

that AUA has no offices in New York or the United States, notwithstanding AUA's

acknowledgement on its website that it is accredited by NYHS and is able to issue federally

guaranteed student loan.  Concededly, the service agreement does not define the term office

and neither does AUA's website which leaves an ordinary person to construe the term in the

ordinary sense as a site in the United States from which AUA oversees its clinical academic

activities and programs.  According to Mr. Solomon's Declaration "None of the coordinators plaintiff has identified were employees.  They appear to be MEA employees."  This use of the word "appear" indicates a lack of certainty.

The service agreement also has a forum selection clause establishing New York as the "venue" for adjudication of disputes between the parties. (5f).  Contrary to Mr. Solomon's assertion, nothing in said agreement states that MEA is responsible for the hiring or has hired the clinical coordinators.  In fact, the agreement describes "managing payroll and compensation for full time and part time employees and consultants with respect to…clinical sciences faculty, clinical Chairman and other personnel in the United States" (5c).  It does not state that MEA employes any of these coordinators.  Not that this would be dispositive given that the coordinators in the past identified themselves to plaintiff as working on behalf of AUA.

Although Clause 7(f) of the service agreement states that the parties are independent contractors and "neither party is an employee, agent, or partner or joint venture of the other", the parties have not conducted their affairs in accordance with the this clause.  For over ten years plaintiff has exchanged emails with AUA's New York office all of which had the following inscription:  *AUA/MEA as agents for American University of Antigua.*  During telephone calls with coordinators, they identified themselves as employees of AUA.Thus, the private service agreement between the parties disclaiming an agency relationship should be given scant weight on this issue, in light of the parties long standing pattern and practice in holding themselves out as principal and agent.

**FRCP Rule 5**

On October 8th, 2019 plaintiff served American University of Antigua/Manipal Education Americas, LLC at its New York City Office located at 1 Battery Palaza, 33rd Floor, New York, NY 10004.  It shares this office with MEA.  Some four months after receipt of service plaintiff

challenges the service as having been improper.  According to Anita O'Brien who according to

the proof of service accepted the summons and complaint, she was not authorized to accept

service on behalf of AUA because she was not an "employee".   This distinction makes

no difference with respect to the effectiveness of service as will be further discussed herein.

      Mr. August Wilson has attached a sworn statement as to the manner in which he

effectuated service. (**Exhibit 3).** He states that he visited 1 Battery Plaza and spoke to someone

in the lobby entrance and advised that he had legal documents to serve.  He was allowed to go

upstairs where he was met by a receptionist, whom he told he had legal documents to serve on

AUA/MEA.  She stated that she would get someone to "accept those for you, at which point Ms.

O'Brien came out and took the documents which were "clearly captioned as court documents".

(Exhibit)  Mr. Wilson states that Ms. O'Brien said nothing "to the effect that she was not

authorized to accept the documents".  (Exhibit)  She gave the server her name as "Anita

O'Brien".  (Exhibit ).  Plaintiff also points the court to two photographs which were taken by Mr.

Wilson at the time of service. (**Exhibits 4 and 5).**  Exhibit 4 depicts the 1 Battery Park address

(faces have been redacted for privacy).  Exhibit 5 shows both the names of AUA-

American University of Antigua in very large bold typeface emblazoned on the wall, as well as

two logos alongside a figure that states Manipal Global.  Immediately aboveAUA's type face is

the following: Manipal Education Americas, LLC: agent for AUA.  This is consistent with

plaintiff's assertions that MEA has been always listed as an agent for AUA  located in New York

City in email exchanges with AUA.

      By challenging service, AUA/MEA asks this court to disregard the true structure of its

principal/agency relationship.  This Circuit has held that FRCP Rule 4 is to be construed liberally

"to further the purpose of finding personal jurisdiction in cases in which the party has received

actual notice".  *Romandette v. Westabix, Co., Inc.,* 807 F.2d 309, 311 (2d Cir. 1986).  Here

plaintiff effectuated service of the summons and complaint within 120 days of having filed the

complaint.  FRCP R. 4(m).  Under defendant's scheme of reasoning neither AUA nor MEA can

be served with a summons and complaint, despite their agency relationship and despite  the

fact that they maintain offices in New York City within the same building, on the same floor, and

within the same space.  As previously stated, this argument is completely lacking in merit.  Ms.

O'Brien's Declaration while claiming that she is not authorized to accept service on behalf of

AUA states that she is an administrative assistant with MEA.  As the agent of AUA, MEA was

authorized to accept service on its behalf, especially where as here both entities held

themselves out as principal-agent.  Significantly, Ms. O'Brien did not reject being served nor

indicate that she was not authorized to accept service on AUA's behalf.

**NBME: Jurisdictional Analysis**

Plaintiff will not repeat the jurisdictional standard of review analysis set forth above,

except to state in this opposition that NBME is subject to both general and specific jurisdiction in

New York State.  Under principles of due process a corporation may be subject to general

jurisdiction in a state only where its contacts are so continuous and systematic that it is

essentially at home in the state.  *Daimler v. Bauman,* 134 S. Ct. 746, 761-62 (2014).  Thus,

aside from an exceptional case, a corporation is generally at home and is subject to general

jurisdiction, consistent with due process in its home state.  Here, defendant NBME

acknowledges that its principal place of business is Philadelphia, Pennsylvania.  It sells its

exams and schedules its own licensing exams throughout the United States, including New York

State.  If NBME's argument against general jurisdiction were to be accepted there would be no

scenario under which a court could ever make a finding of general jurisdiction with respect to a

corporate entity.   Prior to discovery, a plaintiff challenged by a jurisdictional motion may defeat

the motion by pleading in good faith, legally sufficient allegations of jurisdiction.  *Dorchester Fin.*

*Sec.,* 722 F.3d 84.

NBME cites to the case of *Doe v. National Conf. of Bar Examiners,* No. 1:16-cv-264, 2017 WL 74715, at 6 (E.D.N.Y. 2017), which found that an organization that developed and administered bar-related exams in New York was not subject to general jurisdiction. NBME is different from a bar organization that schedules a few exams yearly in states around the country. NBME sells its exams to all medical schools in New York City, onshore and offshore. Once those exams are sold to the schools NBME then makes arrangements with various prometric centers in the State for the taking of the exams , as well as arrange with schools and research hospitals for the taking of the exams. NBME also arrange with doctors who have relocated from foreign countries (and not affiliated with any particular school) to sit exams at the prometric centers around New York State. Thus, NBME's contacts with the State of New York is substantial, continuous, and systematic. Because this litigation is at the pleading stage Plaintiff is unable to articulate with precision the exact scope of defendant's contacts and cannot state whether defendant has employees within the state, agents, offices, bank accounts, property, joint ventures with other entities, the volume of business, and whether it pays state income or property taxes. *Hutton v. Priddy's Auction Galleries, Inc.,* 275 F. Supp. 2d 428, 437 (S.D.N.Y.). Surely, jurisdictional discovery would shed light on these issues.

This court may exercise jurisdiction over defendant under New York's long arm statute. Under C.P.L.R Section 302(a) (1)a court may exercise personal jurisdiction over any non-domiciliary who, either in person or through an agent transact business within the state and if so whether the cause of action arises from such business transaction. *Reich v. Lopez,* 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014). Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant activities were purposeful and there is a substantial nexus between the transaction and the claim asserted. *Kreutter v. McFadden Oil Corp.,* 522 N.E. 2d 40,43 (N.Y. 1988). For example, a defendant's internet contacts may establish jurisdiction under 302(a)(1), *Knight-McConnell v.*

*Cummins. No 035035(NRB). 2005 WL 1398590 (S.D.N.Y. June 13 2005), depending on the nature and quality of commercial activity that a defendant conducts.* The New York Court of Appeals has upheld long-arm jurisdiction where commercial actors have used electronic and telephone means to "project" themselves into New York to conduct business transactions. *Deutsche Bank Sec. 850 N.E. 2d at 1142-43; see also, Chloe v. Queen Bee of Beverly Hills,* 616 F.3d 158, 164 (2d Cir. 2010). (shipment of one handbag into the state combined with employer's extensive contacts with New York sufficed to confer personal jurisdiction).

NBME argues that this court lacks personal jurisdiction because it has no responsibility to arrange accommodations for plaintiff who sit the CCSE exam. NBME maintains that its sole responsibility was to extend accommodation for exams directly offered under its licensing purview.

Plaintiff's complaint does not dispute that one of NBME's core functions is to give licensing exams. However, NBME also engages in other profit making activities by selling exams to medical schools, including offshore schools like AUA. NBME is also well aware that numerous medical schools use its practice exams not just to prepare students for the NBME licensing exams, but to make up part of a student's grade and at times to make the exam a condition precedent to the taking of the NBME formal exams. Thus, NBME is well aware that for the stakes are high with respect to the practice exams.

NBME's argument is flawed insofar as it states that it had nothing to do with the plaintiff's accommodation for the CCSE exam. Plaintiff's complaint avers that NBME was well aware of what accommodation was required for the taking of the CCSE. NBME knew that to permit plaintiff to sit the exam in one day for 9 hours and 11 hours respectively was not reasonable accommodation. This is so because NBME extends over a 2-day period accommodation for the similar USMLE Step 2 CK exam (of the same length, scope, and complexity)with breaks in

between.  The letter from Ms. Kershen to Craig Hauser is clear evidence of NBME's knowledge. Notwithstanding this knowledge, coupled with the fct that NBME has an entire department committed to the evaluation of accommodation issues NBME agreed with AUA that plaintiff should sit the exam at the prometric center under conditions NBME knew were not reasonable. Moreover, NBME had records in its own files regarding the nature of plaintiff's disability and the full panoply of accommodation that may be required.  Plaintiff did not make the arrangements to sit the exam on her own.  it was done through NBME and AUA's New York office.  Thus, plaintiff's complaint is very narrow with respect to NBME.  The allegation is that both AUA and NBME agreed to fashion accommodation for plaintiff that NBME  knew was not reasonable. Thus, given the conspiratorial nature of the decision NBME is liable under the ADA, the Rehabilitation Act, and under principles of third party beneficiary contract.

## NBME's Challenge to Standing

At the pleading stage, a court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party". *United States v. Vasquez,* 145 F.3d 74, 81 (2d Cir. 1998)  A plaintiff has standing if he/she has suffered (1) an injury that is (2) fairly traceable to a defendant's allegedly unlawful conduct, and that is (3) likely to be redressed by the requested relief.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  When a claim arises from a civil rights statute, such as the ADA, courts must exercise special care in conducting standing analysis.  *Harriet and Westchester Disabled on the Move, Inc. v. All Others Similarly Situated,* 352 F. Supp.248, 250 (2018).  Thus, "The Supreme Court has instructed courts to take a broad view of constitutional standing in civil rights cases, especially where as under the ADA, 'complaints by private persons are the primary method of obtaining compliance with the Act.'" *Trafficante v. Metro Life Ins. Co.,* 409 U.S.205,209 (1972).

Here, plaintiff was injured when she was not given reasonable accommodation but was made to sit an exam on two occasions under inhumane terms causing her to fail and thereby

triggering her termination from medical school.  Plaintiff's dismissal is "fairly traceable" to NBME's conduct in approving the taking of the CCSE exam without  requiring accommodation that was "reasonable".  Since NBME had exclusive control and ownership of the exam it could have chosen not to release the exam until AUA came up with an alternative that was reasonable.  In fact, NBME did offer an alternative wherein it would send a proctor to monitor the exam were AUA to find an appropriate site.  When AUA failed to so do, NBME released the exam any way.

NBME's principal argument for lack of standing lies in his view that the court is powerless to offer a remedy because (1) plaintiff is not enrolled in medical school, and (2) if the court orders redress it would be unable to comply as plaintiff is not currently in medical school. NBME has formulated its own structural impediment in order to defeat standing.  This argument would be sound if, only if NBME was the only defendant in the law suit.  However, it stands on equal footing with AUA.  It seeks a dismissal with prejudice, which means that if the court were to enter a judgment against AUA plaintiff would have no recourse against NBME under principles of *res judicata* and issue preclusion.  Even if the court were to dismiss NBME without prejudice it would be problematic because there exists the possibility to foster piecemeal litigation.  To that end, NBME may simply assert that plaintiff is outside the seven and a half year rule for graduating even though the delay is attributable to the defendants unlawful conduct. Since plaintiff's complaint has asserted that both defendants are culpable for not providing reasonable accommodation, the court will be fully capable of selecting a remedy that will redress the parties wrongful conduct.

## <u>CONCLUSION</u>

**Wherefore,** plaintiff respectfully requests that this Honorable Court deny the motions to Dismiss by AUA/MEA and the NBME.

Respectfully submitted,

/s/ Debbie-Ann Bromfield-Thompson
Debbie-Ann Bromfield-Thompson, *pro se*
1405 Kennedy Street, NW
Washington, D.C. 20011
Tel: 202-534-9164

CERTIFICATE OF SERVICE

This is to certify that all counsel of record in this action have been served electronically

via **pacer.gov**.

/s/ Debbie-Ann Bromfield-Thompson